# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

KIT CHECK, INC.,      :
            :
    **Plaintiff,**   :   **Case No. 2:17-CV-1041**
            :
  **v.**         :   **JUDGE ALGENON L. MARBLEY**
            :
            :   **Magistrate Judge Vascura**
HEALTH CARE LOGISTICS, Inc.,  :
            :
    **Defendant.**   :

## OPINION & ORDER

This matter is before the Court on the parties' motions for claim construction. (ECF Nos. 41, 42). This Court held a Markman Hearing on **April 19, 2019.** This Court will construe the disputed claim terms as follows.

## I. BACKGROUND

KCI owns several patents for a product that automates the process for restocking medications. (ECF No. 1 at 1). The KCI Product consists of several parts but can be described as a variation on the following general process: (1) pharmacy items are included in a pharmacy kit; (2) an RFID tag[1] is attached to the pharmacy items or the pharmacy kit itself; (3) the pharmacy kit is put into an electromagnetically shielded container; and (4) a device reads the data on the RFID tags to determine if any of the items are expired, expiring, missing, or the like. (*Id.*). KCI has seven patents for its products, all titled "Management of Pharmacy Kits": U.S. Patent No. 8,990,099 (the "'099 Patent"), issued March 24, 2015; U.S. Patent No. 9,037,479 (the

---

[1] Radio frequency identification ("RFID") tags are labels that can be attached to items and correspond to information about the labelled item. See '099 Patent, col. 2 l. 2, col. 3, l. 28–col. 4 l. 13.

"'479 Patent"), issued May 19, 2015; U.S. Patent Number 9,058,412 (the "'412 Patent"), issued

June 16, 2015; U.S. Patent No. 9,058,413 (the "'413 Patent"), issued June 16, 2015; U.S. Patent

No. 9,367,665 (the "'665 Patent"), issued June 14, 2016; U.S. Patent No. 9,734,294 (the "'294

Patent"), issued August 15, 2017; and U.S. Patent No. 9,805,169 (the "'169 Patent"), issued

October 31, 2017.  (ECF No. 1 at 12).

HCL and KCI were working together to bring KCI's product to market.  KCI has

described "HCL as its supplier to construct the scanning station portion of the KCI Product."

(Id. at 2).  HCL sees its role as more than a supplier and asserts that it "provided design services

to KCI for an RFID reader box . . . ."  (ECF No. 18 at 3).  KCI alleges that it had a nondisclosure

agreement (NDA) with HCL[2] and a separate agreement stating the KCI owned all of the

intellectual property for the product.  (ECF No. 1 at ¶¶ 26–27).  KCI spent over one year refining

its product, cycling at least twelve different designs.  (ECF No. 1 at 8–10).  HCL disputes that

KCI "was the only party performing testing and making suggestions for improvements that were

incorporated into the design, or that any or all improvements were proprietary to Kit Check."

(ECF No. 18 at 5, ¶35).

HCL also sells a system for managing medication refills.  HCL's product line is called

Stat Stock.  HCL's system also uses RFID technology.  HCL asserts that KCI "gave HCL

permission to design, manufacture, offer to sell, and sell RFID boxes that would target a different

market from the large hospital market that Plaintiff was pursuing."  (ECF No. 18 at 24).

On December 14, 2016, KCI sent a letter to HCL "notif[ying] HCL of the Asserted

Patents" (ECF No. 1 at 12) and asking HCL to "cease and desist from its unlawful competitive

---

[2] As HCL notes, KCI does not appear to have signed the NDA, at least not the version it submitted to the Court.
(ECF No. 18 at 19).

activity." (*Id.* at 16). On November 20, 2017, KCI notified HCL that KCI believed HCL was infringing its patents. (ECF No. 1 at 12).

On December 1, 2017, KCI sued HCL for misappropriation of trade secrets under federal and state law, breach of their 2013 Nondisclosure agreement, breach of the 2015 Design Services/Prototyping and Supplier Agreement, and infringement of KCI's seven patents. (ECF No. 1). The parties have filed their claim construction briefs, proposing constructions for disputed claim terms. Since the filing of these claim construction briefs, KCI voluntarily dismissed claims based on the '479 Patent and the '294 Patent.

## II. STANDARD OF REVIEW

Patents typically contain three important sections: (1) drawings of the claimed invention, (2) the specification, and (3) the patent claims. It is the claims of the patent, however, that "define[] the scope of the patentee's rights." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). It is the court's role to construe disputed claim terms. Generally, terms in a patent claim are "given their ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is settled law that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). In determining how a person of ordinary skill in the art ("POSITA") would understand a claim term, courts look not only to "the context of the particular claim in which the disputed term appears, but [also to] the context of the entire patent, including the specification," *id.*, and prosecution history. *Id.* (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). Put another way, courts look to "sources available to the public that show

3

what a person of skill in the art would have understood disputed claim language to mean," including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). In looking to the claims, the court is not limited to the asserted claims "[b]ecause claim terms are normally used consistently throughout the patent." *Phillips*, 415 F.3d at 1314.

The Federal Circuit has consistently held that "[t]he specification is . . . the primary basis for construing the claims." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). But it has also cautioned not to "read[] limitations from the specification into the claim." *Phillips*, 415 F.3d at 1323.

In addition to intrinsic evidence (the claims, specification, and prosecution history), courts may also look to extrinsic evidence, including "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995). Extrinsic evidence, however, is typically less important than intrinsic evidence. *Phillips*, 415 F.3d at 1317.

### III. ANALYSIS

Since the parties have submitted their initial claim construction briefs, the parties have resolved several of the disputed claim terms. The remaining terms to be construed are: (1) pharmacy item, (2) pharmacy kit[s], (3) pharmacy kit template, (4) template, (5) segment, and (6) substitute first pharmacy item/substitute first medication. The parties do not rely on extrinsic evidence for these terms. (See ECF No. 38). In addition to these disputed claim terms, the parties also dispute whether the claims contain "means-plus-function" language.

## A. Pharmacy Item

| Claim Term | KCI's Proposed Construction | HCL's Proposed Construction | Court's Construction |
|---|---|---|---|
| Pharmacy item | Medicine or medicine-related supplies. | Medicines or medical supplies. | Medicines or other medical supplies that may be stocked by a pharmacy. |

At the Markman hearing, the parties agreed that the following construction was acceptable for "pharmacy item": "medicines or other medical supplies that may be stocked by a pharmacy." The Court therefore adopts that construction for "pharmacy item."

## B. Pharmacy Kit[s]

| Claim Term | KCI's Proposed Construction | HCL's Proposed Construction | Court's Construction |
|---|---|---|---|
| Pharmacy kit[s] | Transportable container having a collection of pharmacy items for a common purpose that can be deployed for a specific medical procedure, for a specific physician, or to a designated location. | Transportable container having a collection of medical items for a common purpose that can be deployed for a specific medical procedure, for a specific physician, or to a designated location. | Transportable container having a collection of pharmacy items for a common purpose that can be deployed for a specific medical procedure, for a specific physician, or to a designated location. |

The parties essentially agree on how to define this term; the proposed constructions differ only in that KCI proposes that the term be construed to include "collection of pharmacy items" while HCL's construction proposes "collection of medical items." KCI contends that HCL's proposed construction of "pharmacy kit" is too broad because it includes "medical items" rather than "pharmacy items." HCL argues that KCI's construction improperly reads a limitation from the specification into the claim.

This Court adopts KCI's construction because KCI's construction uses "pharmacy items," a term that will be defined elsewhere for the jury. HCL's construction may inject additional ambiguity into the definition of pharmacy kit[s] that would not be present by using a term defined elsewhere. Additionally, HCL's arguments that KCI is reading a limitation from the specification into the claim goes more to the definition of "pharmacy item" itself rather than the definition of pharmacy kit[s].

## C. Pharmacy Kit Template

| Claim Term | KCI's Proposed Construction | HCL's Proposed Construction | Court's Construction |
|---|---|---|---|
| Pharmacy kit template | Predetermined specification of permissible pharmacy items that form the contents of a pharmacy kit. | A specification that defines the contents of a pharmacy kit containing at least one segment. | A specification that defines the contents of a pharmacy kit and may contain at least one segment. |

The parties disagree on whether "pharmacy kit template" must include a segment. KCI argues that a pharmacy kit template need not include any "segment." A pharmacy kit template without any segments could simply be a list of medications. KCI argues that, where the patentee intended to include the word "segment" it did so explicitly, and reading "segment" into every use of the phrase "pharmacy kit template" would render "segment" superfluous.

HCL argues that "each embodiment described and illustrated by Plaintiff involves a template which defines the contents of a pharmacy kit containing at least one segment." (ECF No. 42 at 9). HCL argues that the inventor is only entitled to what he disclosed and that all of the examples in the patent are examples where the pharmacy kit template includes segments.

The parties' dueling constructions highlight different doctrines on how to read patent claims. On the one hand, "[b]ecause claim terms are normally used consistently throughout the

patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314 (citing *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)). The Federal Circuit has gone so far as to say that "the presence of a dependent claim that adds a particular limitation *gives rise to a presumption* that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315 (emphasis added) (citing *Liebel – Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)). On the other hand, "[t]he descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims must be based on the description." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). In that sense, HCL's reference to the figures and the remainder of the specification as describing only a template with segments has some appeal. *See also LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336 (Fed. Cir. 2005) (finding that a patent did not cover a general process where the specification only described a particular type of process). While *LizardTech* was not construing the claims at issue but rather deciding whether a claim was "invalid for failing to satisfy the written description requirement of 35 U.S.C. § 112," *id.* at 1340, the impact of the specification on the claims may nevertheless shed light on claim construction.

The Federal Circuit has acknowledged that "there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186–87 (Fed. Cir. 1998). As the Federal Circuit has also clarified, however, "[w]hether a claim must, in any particular case, be limited to the specific embodiment presented in the specification, depends in each case on the specificity of the description of the invention and on the prosecution history." *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328 (Fed. Cir. 2000). Where the Federal Circuit

has limited an invention to the embodiments disclosed in the specification, "there were specific reasons dictating a narrow claim construction beyond the mere fact that the specification disclosed only a single embodiment or a particular structure." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004). The Federal Circuit rejected an argument similar to HCL's, that because all of the embodiments in the specification included a particular limitation, the invention necessarily included that limitation. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004). Thus, *LizardTech*, while helpful for purposes of whether the specification meets statutory requirements, does not override the case law directly on point for how to construe claims in light of the specification.

Some claims in the patents at issue do not explicitly refer to a segment as part of the pharmacy kit template. For example, claim 17 of the '412 patent refers to "a pharmacy kit template, wherein the pharmacy kit template indicates a group of pharmacy items that form at least a portion of the pharmacy kit . . . ." '412 patent, col. 20 l. 4–6 (filed Jan. 23, 2015). HCL, however, points out that "the only detailed discussion or illustration of embodiments of templates includes segments." (ECF No. 47 at 5). KCI disputes that, arguing that the "summary" section of the specification describes comparing tag information to a kit template. *See* '099 patent at col. 1 l. 64 – col. 2 l. 29 (filed July 20, 2012). That summary section, however, is written at a highly general level. It does not disclose the use of any templates, even though the detailed description does include descriptions of how to use a template with segments. Nevertheless, the patentee showed himself capable of using the term "segment" when he wanted to denote a template with segments. Other times, the claims contain no such segment requirement. Additionally, the prosecution history does not appear to reflect any goal, on behalf of the patentee, to limit the invention to templates with segments. Therefore, a template need not always include a segment.

Because a template *may* include a segment, this Court will adopt the following construction for pharmacy kit template: "A specification that defines the contents of a pharmacy kit and may contain at least one segment."

### D. Template

| Claim Term | KCI's Proposed Construction | HCL's Proposed Construction | Court's Construction |
|---|---|---|---|
| Template | Predetermined specification of permissible pharmacy items that form the contents of a pharmacy kit. | A specification that defines the contents of a kit containing at least one segment. | A specification that defines the contents of a pharmacy kit and may contain at least one segment. |

KCI has argued that it is not necessary to construe the term "template" because it only appears as part of the term "pharmacy kit template" which is already submitted for construction. HCL does not offer a reason for why it is necessary to construe this term but has supplied a proposed construction that is almost identical to its proposed construction for "pharmacy kit template," the only difference being that HCL's proposed construction for "template" appears to apply to "a kit" while "pharmacy kit template" would appear to apply to "a pharmacy kit." This Court does not find it necessary to supply any additional definition for this term. The patents deal only with pharmacy kits, not kits in general. Therefore, this Court adopts the same construction for "template" as for "pharmacy kit template."

### E. Segment

| Claim Term | KCI's Proposed Construction | HCL's Proposed Construction | Court's Construction |
|---|---|---|---|
| Segment | Class or type of item(s) or additional segments. | Class of items defined by a common characteristic. | Class or type of item(s) or additional segments. |

KCI argues that it's definition of "segment" is included in the specification and that, where the specification "reveal[s] a special definition given to a claim term by the patentee . . . the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. The specification language is as follows: "each item segment corresponds to a class or type of items and/or additional segments to be included in specific quantities." '099 patent, col. 8, ll. 1–3. HCL argues that KCI's definition is vague and redundant because it uses the defined term in the definition.

HCL points to language in the specification that reads as follows: "an item segment may define a specific class of medications, such as ibuprofen, acetaminophen, adenosine, or albuterol," '099 patent, col. 8, ll. 3–5. HCL relies on this language from the specification to argue that its definition is more complete because it defines "class" as items sharing a "common characteristic." HCL points to the possibility of substituting items and draws from such substitutions that the items must share common characteristics. KCI argues that not every segment contains alternatives.

Both parties assert valid critiques of the other's proposed construction. Generally, a definition should not include the word it is defining. But the specification defines specifically "segment" here and that definition attempts to include the concept of a multi-level template. Thus, although KCI's proposed construction includes the word it is defining, the definition is not confusing. Therefore, this Court will adopt KCI's proposed construction. This construction is not vague or overly redundant because the construction adequately explains that generally, a segment is a class or type of item but a segment can also include additional segments.

**F. Substitute First Pharmacy Item/Substitute First Medication**

| Claim Term | KCI's Proposed Construction | HCL's Proposed Construction | Court's Construction |
|---|---|---|---|
| Substitute first pharmacy item/substitute first medication | Plain and ordinary meaning. | Substitute refers to an available drug/pharmacy item/medication identified by the template as an alternative to another drug/pharmacy item/medication. | Available drug/pharmacy item/medication identified by the template as an alternative to another drug/pharmacy item/medication. |

KCI argues that this term can be given its plain and ordinary meaning and that HCL is attempting to read a limitation from the specification into the claim. KCI argues that not every claim requires the substitute to be specified in the template. Rather, the claims leave "open the possibility that a substitute be identified in other ways, for example, through a comparison chart in a central database." (ECF No. 41 at 23). For example, claim 14 of the '099 patent reads: "determine that a . . . substitute first medication is present based at least in part on the tag information." HCL argues that the term must include the limitation that the substitute is defined in the pharmacy kit template. Otherwise, the word "substitute" would be meaningless because a substitute has to be defined by something.

This Court adopts HCL's proposed construction, with only slight modification as noted above. Even in claim 14 of the '099 patent, the dependent claims refer to verifying the kit against a template. KCI has suggested that, aside from specifying the substitute in the template, the substitute could be specified "through a comparison table in a central database." (ECF No. 41 at 23). While it would generally be understood what a substitute is, what item may substitute for another item must be specified somewhere; otherwise, the system could not identify a

possible substitute.  Therefore, substitute will be construed to require the template to specify the substitute.

### G.  Means-Plus-Function Claims

Means-plus-function claiming is an alternative means for claiming a patented invention. Means-plus-function claiming "allow[s] patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015).  But, in exchange for invoking means-plus-function claiming, the scope of the patent is restricted "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof."  *Id.* (citing *Northrup Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1350 (Fed. Cir. 2003)).  Means-plus-function claiming is defined as follows:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital for structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112(6).

Language is not means plus function if "the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).  When the claims do not contain the word "means," there is a presumption that the claim is not means plus function. *Id.*  That "presumption can be overcome . . . if the challenger demonstrates that the claim term fails to 'recite[ ] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* at 1348 (quoting *Watts v. XL Sys., Inc.,* 232 F.3d 877, 880 (Fed.Cir.2000)).  To determine "whether this presumption has been rebutted, the

challenger must establish by a preponderance of the evidence that the claims are to be governed by § 112, ¶ 6.” *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 *(citing Greenberg v. Ethicon Endo–Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996)).  In addition to the word “means,” nonce words may also invoke a means-plus-function interpretation.  Nonce words are “[g]eneric terms such as ‘mechanism,’ ‘element,’ [and] ‘device,’ . . . that reflect nothing more than verbal constructs” and are equivalent “to using the word ‘means’ because they ‘typically do not connote sufficiently definite structure’ . . . .” *Williamson*, 792 F.3d at 1350.

Additional words in the claim can transform what would otherwise be means-plus-function language into sufficiently definite structure.  For example, the Federal Circuit has held that “detent mechanism” was not means plus function because “‘[d]etent’ denotes a type of device with a generally understood meaning in the mechanical arts . . . . [including] ‘a mechanism that temporarily keeps one part in a certain position relative to that of another, and can be released by applying force to one of the parts.’” *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996).  A claim term may have sufficiently definite structure even if it “does not specifically evoke a particular structure.”  *Personalized Media Commc’ns, LLC v. Int’l Trade Comm’n*, 161 F.3d 696, 705 (Fed. Cir. 1998).  In other words, the claim “may describe a class of structures.”  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1300 (Fed. Cir. 2014) (overruled on other grounds) (citing *Personalized Media Communications, LLC v. Int’l Trad Comm’n*, 161 F.3d 696, 705 (Fed. Cir. 1998)).

Once a court determines that a claim term is means plus function, the inquiry is two-fold:

The court must first identify the claimed function.  *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed.Cir.2012).  Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function.  Where there are multiple claimed functions, as we have here, the patentee must disclose adequate corresponding structure to perform all of the

claimed functions.  *Id.* at 1318–19.  If the patentee fails to disclose adequate corresponding structure, the claim is indefinite.  *Id.* at 1311–12.

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351–52 (Fed. Cir. 2015).  The parties have requested that, in the first instance, this Court determine only "whether the terms are 'means plus function' terms under 35 U.S.C. § 112(6)."  (ECF No. 39 at 1).  If this Court finds that any of the terms are means plus function, the parties will attempt to agree on the second issue and possibly submit additional briefing.  (Id. at 1–2).  This Court adopted the parties' proposal to proceed in this bifurcated manner.  (ECF No. 40).

HCL contends that the claims contain means-plus-function language.  The parties' initial Joint Claim Construction and Prehearing Statement (ECF No. 38) lists several claims, but the claim construction briefing focuses on the following: (1) "information processing system," (2) "computer executable instructions," (3) "computer readable medium"/"computer storage medium," and (4) "processors."  (ECF No. 42 at 23).  HCL argues that these words do not connote sufficiently definite structure; rather, these terms are generic terms for performing the functions specified in the patent–for example, determining substitutes.  (ECF No. 47 at 14).  The terms that HCL has identified are used at various places throughout the asserted patents, but the patents use the terms, essentially, in the following ways:

Claim 9 of the '412 patent: "data is stored at the **information processing system**"

Claim 26 of '413 patent: "wherein the **information processing system** and the RFID reader are distinct and communicate via at least one of a local area network"

Claim 1 of the '665 patent: "an **information processing system** communicatively coupled to a radio frequency identification (RFID) reader, the **information processing system** comprising **computer-executable instructions** that when executed by one or more **processors** cause the one or more **processors** to: . . ."

Claim 24 of '665: "a non-transitory, **computer-readable [or storage] medium** storing **computer-executable instructions** that when executed by one or more **processors**, cause the one or more **processors** to at least: . . .

Claim 49 of the '169 patent: "and an **information processing system**, configured to: . . . the **information processing system** is configured to at least one of: . . .

None of the terms that HCL has identified includes the term "means" or a "nonce" word that takes the place of "means." Therefore, there is a presumption that the claims are not means-plus-function claims. HCL must overcome this presumption by a preponderance of the evidence. Where, as here, the claims use neither the word "means" nor a "nonce" word, "[t]he correct inquiry . . . is whether the limitation, read in light of the remaining claim language, specification, prosecution history, and relevant extrinsic evidence, has sufficiently definite structure to a person of ordinary skill in the art." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (overruled on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)).

### 1. Information Processing System and Processors

HCL contends that both "information processing system" and "processors" invoke means-plus-function claiming. Cases have reached differing conclusions on whether "processor" connotes sufficiently definite structure. *See, e.g.*, *Konami Gaming, Inc. v. High 5 Games, LLC*, No. 2:14-cv-01483, 2018 U.S. Dist. LEXIS 28337, at *11 (D. Nev. Feb. 21, 2018) (finding that "processor configured to execute a game" is means plus function); *GoDaddy.com, LLC v. RPost Communs. Ltd.*, No. CV-14-00126, 2016 U.S. Dist. LEXIS 5955 (D. Ariz. Jan. 19, 2016) (finding that "processor for associating" is means plus function); *Smartflash LLC v. Apple Inc.*, 6:13-CV-447, 2015 WL 4208754, at *3 (E.D. Tex. July 7, 2015) (finding the term "processor" not to be a means-plus-function term); *Advanced Mktg. Sys., LLC v. CVS Pharm., Inc.*, Nos.

6:15-cv-134, 6:15-cv-137, 2016 WL 1741396, at *19-20 (E.D. Tex. May 3, 2016) (finding "data processor" not to be a means-plus-function term); *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-cv-05808, 2015 WL 7770208, at *9-11 (N.D. Cal. Dec. 3, 2015) (finding the term "content processor" not to be means plus function); *St. Isidore Research, LLC v. Comerica Inc.*, No. 2:15-cv-1390, 2016 U.S. Dist. LEXIS 126866, 2016 WL 4988246 (E.D. Tex. Sept. 18, 2016) (finding "processor configured for" was means plus function but "transaction processing module" was not).

Cases interpreting the use of "processor" fall into two categories. On the one hand, claims that refer to "processors" used to perform a particular function, such as "processor configured to execute a game" in *Konami Gaming, Inc.* or "processor for associating" in *GoDaddy.com, LLC*, invoke means-plus-function claiming. But claims that refer to a processor as a self-defined object such as "data processor," *Advanced Mktg. Sys., LLC v. CVS Pharm., Inc.*, No. 6:15-cv-134-JRG-KHM, 2016 WL 1741396, or "content processor," *Finjan, Inc. v. Proofpoint, Inc.*, 2015 WL 7770208, are not means plus function. *See also St. Isidore Research, LLC*, 2016 WL 4988246 (finding "processor configured for" was means plus function but "transaction processing module" was not). Put another way, "if the functions performed by the processor are functions typically found in a commercially available off-the-shelf processor, then a skilled artisan might understand the term 'processor' to provide sufficient structure for performing those functions." *GoDaddy.com, LLC*, at *171. But, if the functions are not those typically available in an off-the-shelf processor, then "the structure disclosed in the specification [must] be more than simply a general purpose computer." *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). "Processor," has been found to recite sufficiently definite structure where "the claims recited how the processor terms were connected

with other claim limitations and those connections were described in the patents." *St. Isidore Research, LLC*, 2016 WL 4988246, at *15 (internal citations omitted). *See also Smartflash LLC v. Apple Inc.*, 77 F. Supp. 3d 535, 545 (E.D. Tex. 2014); *Advanced Mktg. Sys., LLC v. CVS Pharm., Inc.*, No. 6:15-cv-134-JRG-KHM, 2016 WL 1741396 (E.D. Tex. May 3, 2016).

Here, the asserted claims only refer to processor as its own structural component, much like "data processor" found not to be means plus function in *Advanced Mktg. Sys., LLC* and "content processor," found not to be means plus function in *Finjan, Inc. v. Proofpoint, Inc.* Additionally, KCI has submitted technical dictionaries that define "processor" and submitted a Declaration from KCI's expert, Jeffrey Fischer, explaining how a POSITA would have understood the term "processor" in the patents. (ECF No. 41-4). The dictionaries, and Mr. Fischer's Declaration, show that a POSITA would understand "processor" to encompass the category of items that comprise "[t]he portion of a computer which has the necessary circuits to interpret and execute instructions, and to control all other parts of the computer." (ECF No. 41-4 at 7, quoting Wiley Electrical and Electronics Engineering Dictionary). Thus, the term "processor" is similar to "detent" that the Federal Circuit found to recite sufficiently definite structure in *Greenberg*. Additionally, although some claims refer to ""a non-transitory, computer-readable medium storing computer-executable instructions that ***when executed by one or more processors, cause the one or more processors to*** . . .," '665 Patent col. 21 l. 44–46, (emphasis added), and list several resulting actions the processors take, those claims focus on the computer executable instructions. The "processors" in those claims are performing the function of executing the instructions, a function that any general purpose computer can perform, as evidenced by the dictionary definition above. Thus, the term "processor," used in this way, does not invoke means-plus-function claiming.

17

HCL also contends that "information processing system" invokes means-plus-function claiming. The asserted patents use the term "information processing system" in two main ways. First, some claims use "information processing system" to describe part of the claimed system, such as in Claim 1 of the '665 patent:

> 1. A system, comprising:
> a pharmacy kit container that includes an enclosed space for receiving a pharmacy kit and at least one door, wherein the enclosed space is accessible through the at least one door, and wherein the pharmacy kit container provides electromagnetic shielding; and
> ***an information processing system*** communicatively coupled to a radio frequency identification (RFID) reader, the ***information processing system*** comprising computer-executable instructions that when executed by one or more processors cause the one or more processors to: . . . .

'665 Patent, col. 17 ll. 38–49 (emphasis added).

Claims described as above are not means plus function. These claims explain how the information processing system is connected to other parts of the invention. *See, e.g.*, *Finjan*, 2015 WL 7770208 (finding that a claim was not means plus function because, in part, the claim "describes how the 'content processor' interacts with the invention's other components"). And the specification states that "the RFID reader receives information identifying each tag, and it conveys the information to information processing system 115." '665 Patent, col. 5 ll. 64–66. The patents thus explain how the information processing system is connected to other parts of the invention, the components of the information processing system, and how the components of the information processing system interact with each other—namely where the RFID tags are located, that the processors are executing the instructions, and that an antenna causes the RFID tags to communicate with the processors. '665 Patent, col. 17 ll. 44–67.

Two minor variations on these information processing system claims bear mentioning. First, claim 26 of the '413 Patent adds the variation that "the information processing system and

18

the RFID reader are distinct and communicate via at least one of a local area network, a cellular network, or Internet." '413 Patent col. 20 ll. 42–45. This use of "information processing system" is not means plus function. This claim merely changes how the information processing system is connected to the RFID reader. Second, claim 9 of the '412 Patent adds that "the pharmacy item data is stored at the information processing system." '412 Patent col. 18 ll. 46–47. HCL has not addressed this claim separately from the use, generally, of "information processing system" but regardless, the claim specifies that an information processing system includes a processor. Storing information is a function that a general purpose computer can perform. Thus, this claim is not means plus function. *See In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (citing *Aristocrat*, 521 F.3d at 1333–34; *Harris*, 417 F.3d at 1253; *WMS Gaming*, 184 F.3d at 1349) (finding that a general purpose computer is sufficient structure for performing "processing," "receiving," and "storing").

Second, other claims use "information processing system" as follows

49. A system for managing a pharmacy kit, the system comprising:
a pharmacy kit container that includes electromagnetic shielding material;
. . . ; and
an *information processing system*, configured to:
verify a pharmacy kit based at least in part on the tag information, wherein to
verify the pharmacy kit, the information processing system is configured
to at least one of:
determine that a substitute pharmacy item for a first pharmacy item is
located within the pharmacy kit container, . . . .

'169 Patent col. 23 l. 61–col. 24 l. 21.

Claim 51 of the '169 patent specifies that "the information processing system is remotely located from the RFID reading station." '169 Patent col. 24 ll. 36–38. Claim 54 adds functions that the information processing system performs:

the information processing system is further configured to:

19

> determine a kit type based at least in part on the second tag information, and
>
> identify a pharmacy kit template from a plurality of pharmacy kit templates based at least in part on the determined kit type, and
>
> verify the pharmacy kit based at least in part on the first tag information and the identified pharmacy kit template.

'169 Patent col. 24 l. 61–col. 25 l. 3.  Subsequent dependent claims state similarly.

These claims are means plus function.  The claims identify "specific functions that would need to be implemented by programming a general purpose computer to convert it into a special purpose computer capable of performing those specified functions."  *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (citing Aristocrat, 521 F.3d at 1333 – 34; Harris, 417 F.3d at 1253; WMS Gaming, 184 F.3d at 1349).  General purpose computer functions are generally considered "processing," "receiving," and "storing."  *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d at 1316.  Here, the claims refer to, among other things, determining a kit type and identifying a template.  These are not functions that a general purpose computer performs.

KCI has submitted the declaration of Jeffrey Fischer to show that "information processing system" connotes sufficient structure.  Mr. Fischer has opined that a POSITA would understand "information processing system" to mean "a computer system, which, as stated in the specification and claims, consists of at least a processor; computer-executable instructions; computer-readable medium or computer storage medium; and optionally including a local area network (LAN), a client/server system, and/or an internet connection."  (Fischer Dec. ¶ 49).  As Mr. Fischer's explanation shows, an information processing system is different from a simple processor.  A "processor" term can be found to have sufficient structure if it specifies how the processor interacts with other parts of the claimed invention.  As Mr. Fischer's Declaration shows, however, an information processing system is made up of various components.  Claims

20

such as Claim 49 of the '169 Patent, and its dependent claims do not specify what part of the information processing system is performing the "verify" and "determine" functions.

Mr. Fischer has pointed to the specification to provide "further description for the structure," but whether the specification defines any structure for performing the functions, and what that structure is, is an inquiry the parties have requested to defer to a later stage. At this point, this Court is only determining whether the claims are means-plus-function claims. This Court therefore finds that claims 49, 54, 55, 57–60, 64–66, 79, 80, and 85 of the '169 Patent are means plus function.

### 2. *Computer Readable Medium/Computer Storage Medium*

HCL contends that "computer readable medium" and "computer storage medium" are means-plus-function terms. HCL points to Claim 24 of the '665 patent as an example. Claim 24 states: "A non-transitory, computer-readable medium storing computer-executable instructions that when executed by one or more processors, cause the one or more processors to at least: . . . ." '665 patent, col. 21, ll. 44–47. HCL argues that this claim "is the exact type of claim for which 35 U.S.C. § 112 ¶ 6 was created." (ECF No. 47 at 14). HCL argues that "medium" is a generic word. But KCI's expert's declaration and the technical dictionaries that KCI has submitted show that "computer readable medium" and "computer storage medium" merely refer to what a person of ordinary skill in the art would consider to be a class of structures.

A claim term does not need to "specifically evoke a particular structure" to avoid means-plus-function claiming, *Personalized Media Commc'ns, LLC*, 161 F.3d at 705, and "may describe a class of structures." *Apple Inc.*, 757 F.3d at 1300 (overruled on other grounds) (citing *Personalized Media Communications, LLC*, 161 F.3d at 696). KCI's expert identified various examples of a computer readable or computer storage medium, including "memory, magnetic

disks, and tapes." (ECF No. 41-4 at 10). KCI also submitted a dictionary that provides at least

one definition of "medium" as "material used for storage of information. Magnetic disks, tapes,

and optical disks are examples of storage media." (ECF No. 41-3 at 6, Dictionary of Computer

and Internet Terms). This evidence shows that computer readable medium and computer storage

medium refer to a class of structures known to a person of ordinary skill in the art. Thus,

computer readable medium and computer storage medium are not means-plus-function terms.

### 3.  Computer Executable Instructions

HCL next contends that "computer executable instructions" invokes means-plus-function

claiming. HCL has pointed to claim 14 of the '099 Patent as an example. Claim '14 reads, in

part:

computer-executable instructions that when executed by one or more processors cause the one or
more processors to:
. . . verify the plurality of medications using the tag information, wherein to verify at least a first
    medication of the plurality of medications the computer-executable instructions cause the
    one or more processors to:
    determine that a first medicinal container associated with the first medication is not
        present based at least in part on the tag information received from the plurality of
        RFID tags,
    determine that a first medicinal container configured to store a substitute first medication
        is present based at least in part on the tag information, and
    determine that an expiration of the substitute first medication satisfies an expiration
        threshold based at least in part on the medication data associated with a first RFID
        tag of the plurality of RFID tags, wherein the first RFID tag is coupled to the
        second medicinal container, and
    cause a display to display results of the verification of the plurality of medications including
        information regarding the substitute first medication.

'099 Patent col. 19 ll. 41–43; col. 20, ll. 9–27.

The phrase "computer-executable instructions" is readily understood by persons of

ordinary skill in the art. KCI has provided a dictionary definition for "instruction" as follows:

    1. A command or statement in a computer program or routine. Also called
    computer instruction (1). 2. A computer instruction in machine code. Such an

instruction can be directly executed by a processor.  Also called machine
instruction, or computer instruction (2).

Steve M. Kaplan, *Wiley Electrical and Electronics Engineering Dictionary* 377 (2004).

It is generally accepted that "instructions" or "code" recite structure.  *See, e.g.*, *Syncpoint Imaging, LLC v. Nintendo of America Inc.*, No. 2:15-cv-00247-JRG-RSP, 2016 WL 55118, at *23 (E.D. Tex. Jan. 5, 2016) (finding that "'instruction' connotes structure"); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, Nos. 04 C 5312, 05 C 1079, 05 C 4088, 05 C 4120, 05 C 4811, 05 C 5164, 2006 WL 3147697, at *12 (N.D. Ill. Oct. 31, 2006) (finding that "code" recites structure); *Collaborative Agreements, LLC v. Adobe Systems Incorporated*, No. 15-cv-03853-EMC, 2015 WL 7753293, at *4 (N.D. Cal. Dec. 2, 2015) (finding that "'code segment' suggests some kind of structure").  Similar to "processor" claims, courts have found that "instructions" or "code" claims are not means plus function where the claims "recite the objectives and operations of the instructions." *Syncpoint Imaging, LLC*, 2916 WL 55118, at *23–24 (collecting cases).  Several cases have analogized the use of the term "code" to use of the term "circuit."  *See, e.g*, *Aloft Media, LLC v. Adobe Systems Inc.*, 570 F.Supp.2d 887, 897 (E.D. Tex. 2008) (comparing "computer code" to "circuit"); *Trading Techs. Int'l Inc.*, 2006 WL 3147697, at *12 (comparing "program code" to "aesthetic correction circuitry").  The Federal Circuit has held that "when the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004) (citing *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1373 (Fed. Cir. 2003)).

HCL argues that the claims "provide no guidance as to the structure of the computer instructions on how the determining steps and displaying steps are supposed to occur." (ECF No. 47 at 14). HCL argues that "[t]here is no indication in the claims how the processor is supposed to actually receive the tag data, and there is no detail in the claims regarding how the processor is supposed to go about the step of verifying the tag information, for determining a substitute, or any other method of verification." (ECF No. 42 at 24). Nor do the claims describe the type or structure of the display. (*Id.*). HCL has submitted no evidence as to why the "computer-executable instructions" claims are means plus function other than to argue based on what has been omitted from the claims.

HCL's arguments require too much from the claims. As several cases have found, the term "code" or "instructions," connote at least some structure. *See, e.g.*, *Syncpoint Imaging, LLC*, 2016 WL 55118, at *23 (finding that "'instruction' connotes structure"). This structural understanding of the term "instructions," coupled with HCL's lack of evidence to rebut "the presumption that § 112 ¶ 6 does not apply" is enough to conclude that the terms are not means plus function. *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1373 (Fed. Cir. 2003) (finding a challenger's evidence insufficient to overcome the presumption that "'circuit' . . . connotes some structure" where all the challenger put forth were district court cases and the preferred embodiments in the patent specification). But because the Federal Circuit reached such conclusion prior to *Williamson*, when the presumption against applying § 112 ¶ 6 was strong, this Court will further consider whether the "computer-executable instructions" terms are sufficiently coupled with a function of the instructions to avoid the application of § 112 ¶ 6.

Here, the computer-executable instructions referenced in the claims cause the one or more processors to determine, at least: (1) whether a first medication is missing from a pharmacy

kit; (2) determine that a substitute is available; (3) determine that the substitute is not expired; and (4) display the results. '099 Patent, col. 20, ll. 11–28. The other patent claims provide similarly. *See, e.g.*, Claims 1, 17 of the '412 patent; Claims 1, 15 of the '413 patent; claims 1, 24, 25 of the '665 Patent; Claim 22 of the '169 Patent.

HCL reads the "computer executable instructions" claims out of context when it suggests that the claims do not indicate how the processors receive RFID tag information. Before the "verify" portion of claim 14, the claim specifies that the computer-executable instructions

> cause the one or more processors to: receive tag information of a plurality of radio frequency identification (RFID) tags coupled to a plurality of medicinal containers based at least in part on the antenna emitting a radio signal at least within the pharmacy kit container.

'099 Patent, col. 19 ll. 42–48.

The claims specify how the processors receive information (through an antenna emitting a radio signal) and from where (the RFID tags coupled to a plurality of medicinal containers). Other parts of the claim specify that the RFID tag contains medication data including "an identifier of the particular medication and an expiration of the particular medication." '099 Patent, col. 20 ll. 6–8. Taken together, these "computer executable instructions" claims describe the "objectives and operations of the instructions," *Syncpoint Imaging, LLC*, 2016 WL 55118, at *23. HCL attempts to distinguish these claims from those in *Collaborative Agreements, LLC*, by arguing that the functions here are "more broadly phrased high-level functions such as 'receiving communications' or 'coordinating the operation of the streaming data module.'" (ECF No. 47 at 16) (quoting *Collaborative Agreements, LLC*, 2015 WL 7753293, at *14). But the claims here are not as generalized as HCL contends. As an example, claim 14 of the '099 Patent describes several steps for determining whether a substitute medication is available. '099 Patent col. 20 ll.

25

13–24.  Additionally, other district courts have found fairly high-level functions, coupled with "code" to provide sufficient structure.  *See, e.g.*, *Convolve, Inc. v. Dell, Inc.*, No. 2:08–CV–244–CE, 2011 WL 31792, at \*18 (E.D. Tex. Jan. 5, 2011) (finding "code [to generate/providing] a user interface" not subject to § 112 ¶ 6); *SuperSpeed, L.L.C. v. Google, Inc.*, No. H–12–1688, 2014 WL 129225 (S.D. Tex. Jan. 14, 2014) (finding that terms such as "executable remote messaging code" were not means plus function where such terms were "modified by language that describes the code's functioning within the invention, i.e., performs interception, performs invalidation, and performs remote messaging").  Thus, "computer executable instructions" does not invoke means-plus-function claiming.

## IV. CONCLUSION

The Court adopts the constructions of the disputed claim terms as set out above.  The only claims that contain means-plus-function language are claims 49, 54, 55, 57–60, 64–66, 79, 80, and 85 of the '169 Patent.  In accordance with the parties' agreement (ECF No. 39) and this Court's prior ruling (ECF No. 40), the parties have twenty days from the date of this Order to submit agreed identification of function and structure for these claims or a proposed briefing schedule if disputes remain.

Additionally, the parties have reported that the Patent Trial and Appeal Board has denied HCL's request for inter partes review.  Thus, HCL's Motion to Stay (ECF No. 48) is hereby **MOOT.**

**IT IS SO ORDERED.**

  **s/ Algenon L. Marbley**
  **ALGENON L. MARBLEY**
  **UNITED STATES DISTRICT JUDGE**

**DATED:  August 30, 2019**